**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello**

Civil Action No. 21-cv-02559-CMA-SBP

LAURI LITTLEWOOD,

     Plaintiff,

v.

NOVARTIS PHARMACEUTICALS CORP.,

     Defendant.

---

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

This matter is before the Court on Defendant Novartis Pharmaceuticals Corp.'s ("Novartis") Motion for Summary Judgment. (Doc. # 85.) For the following reasons, the Motion is denied.

## I.    BACKGROUND[1]

This is an employment case brought by Plaintiff Lauri Littlewood against her former employer, Novartis. Following the grant (Doc. # 47) of Novartis' Partial Motion to Dismiss (Doc. # 34), Ms. Littlewood sought and was granted the opportunity to file her Third Amended Complaint (Doc. # 53), which remains the operative pleading in this action. In the Third Amended Complaint, Ms. Littlewood asserts one claim against

---

[1] Unless otherwise indicated, the following facts are undisputed. (Doc. # 85 at 2–12; Doc. # 86 at 5–18; Doc. # 87 at 2–7.)

Novartis: unequal pay in violation of the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. §

206(d). (*Id.* at ¶¶ 23–29.)

## A.   PLAINTIFF'S EXPERIENCE AND EMPLOYMENT

Ms. Littlewood, a female, began working for Novartis in April 2015. (Doc. # 86-3

at 3.)[2] Various documents refer to her position as "Cardio Executive Specialist" (*id.* at 2;

Doc. # 86-4 at 2), "Cardiovascular Sales Specialist" (Doc. # 86-5 at 3), and "Cardio Sr.

Specialist." (Doc. # 86-4 at 2; Doc. # 86-5 at 2.) Amongst other responsibilities, Ms.

Littlewood's job required her to meet with physicians to promote the health benefits of

Entresto©, a medication for heart failure patients. (Doc. # 85-1 at 13; Doc. # 86-5 at 3–

4.) Specifically, as a "Cardiovascular 1" ("CV1"), Ms. Littlewood focused on selling to

cardiologists. *See* (Doc. # 85-4 at 20; Doc. # 86-9 at 32.) Her sales territory changed

somewhat during her time with Novartis, but when she was first hired it included

Northern Colorado—including Boulder and a portion of Denver—most of Wyoming, and

a portion of Eastern Montana. (Doc. # 85-1 at 13.) Ms. Littlewood's starting base salary

at Novartis was $104,000 per year. (Doc. # 86-3 at 2); *see also* (Doc. # 85-2 at 12.)

For the twenty-seven months immediately prior to joining Novartis, Ms. Littlewood

worked for a small pharmaceutical company, Pensacola Apothecary ("Pensacola").

(Doc. # 85-1 at 24; Doc. # 86-11 at 2.) In addition to bonus potential, Ms. Littlewood's

base salary at Pensacola was $102,793. (Doc. # 86-1 at 21–22.) Prior to Pensacola,

Ms. Littlewood worked for multiple large pharmaceutical companies including Hoffman-

---

[2] The Court cites the docket number (*e.g.*, Doc. # 86-3) and the page number applied by the court docketing system in blue in the header of each document (*e.g.*, Doc. # 86-3 at 3).

La Roche ("La Roche"), Eli Lilly & Co., and Astellas Pharmaceuticals. (Doc. # 86-2 at 22; Doc. # 86-11 at 2–3.) Several of these positions were in the Colorado market. (Doc. # 86-2 at 22–23; Doc. # 86-11 at 2.) Ms. Littlewood testified that at the time of her hire with Novartis, cumulatively she had over 20 years of experience in pharmaceutical sales, including 14 years consecutive experience with La Roche, seven years of cardiology experience, experience launching approximately 12 pharmaceutical products, as well as hospital and clinic-based experience. (Doc. # 86-1 at 8, 13, 25–26, 51); *see also* (Doc. # 86-11 at 2–3.)[3]

Ms. Littlewood earned several awards prior to her employment with Novartis including from La Roche in 1994, 1997, 1999, and 2000, one Quota Trip Award with Eli Lilly & Co., and a regional Special Achievement Award. (Doc. # 86-1 at 48–50, 62; Doc. # 86-11 at 3.) Ms. Littlewood's formal education consists of a Bachelor of Science. (Doc. # 86-2 at 30; Doc. # 86-11 at 3.) She does not have a master's degree in business administration ("MBA") and has never been in school to earn in MBA. (Doc. # 85-1 at 27.)

## B.    JOSHUA ZUIEBACK'S EXPERIENCE AND EMPLOYMENT

In March 2016 Novartis hired Joshua Zuieback, a male. (Doc. # 85-3 at 3.) At the time of his hire, Mr. Zuieback had 17 years consecutive pharmaceutical sales experience with Merck & Co., Inc. ("Merck") in the Colorado region, primarily in the area of vaccines. (Doc. # 85-5 at 2; Doc. # 86-12 at 2.) At Merck, Mr. Zuieback earned

---

[3] The Court notes that Ms. Littlewood's resume does not include years for all her prior work experience. *See* (Doc. # 86-11 at 2–3.)

several awards including multiple Vice President Club awards, the MVP award for four years, the Hall of Fame award, and various teamwork awards. (Doc. # 85-5 at 3); *see also* (Doc. # 85-1 at 43.) In addition to his Bachelor's degree, Mr. Zuieback earned a MBA in 2003. (Doc. # 85-5 at 3.) Mr. Zuieback was also involved in his community, including holding positions with local organizations. (*Id.* at 2–3); *see also* (Doc. # 85-1 at 43–44.) By the time he left Merck, Mr. Zuieback's base salary was $115,000 and he was set to earn a merit increase to $120,000. (Doc. # 85-2 at 18.) At Merck Mr. Zuieback also had the potential to earn a bonus. (*Id.*)

Mr. Zuieback's position at Novartis is alternatingly referred to as "Cardiovascular Executive Sales Specialist" (Doc. # 85-3 at 2), or "Cardio Sales Specialist" (Doc. # 86-6 at 2, 3). Despite the slight differences in language, Novartis appears to agree that Ms. Littlewood and Mr. Zuieback held the same title (Doc. # 86-8 at 9; Doc. # 86-9 at 31–32), with the exception that, as a "Cardiovascular 2" ("CV2") Mr. Zuieback focused on selling Entresto© to primary care physicians and, at times, reported to a different manager. *See* (Doc. # 85-4 at 20; Doc. # 85-10 at 9, 17–18; Doc. # 86-9 at 32.)

Mr. Zuieback worked in the same geographic area and his sales territory overlapped with Ms. Littlewood's, although the exact extent of that overlap changed throughout their time with Novartis. (Doc. # 85-4 at 20; Doc. # 86-8 at 9; Doc. # 86-9 at 32–33; Doc. # 86-10 at 19.) Ms. Littlewood testified that the "vast majority" of physicians on her customer list also appeared on Mr. Zuieback's, they collaborated on shared targets, and had lunch with physicians together once or twice a month. (Doc. # 86-1 at 10–11, 14–17.) On Ms. Littlewood's 2019 Year-End Performance Review, John

4

Gatrell—Senior Area Business Leader and, for a time, the direct supervisor of both Ms. Littlewood and Mr. Zuieback—described Ms. Littlewood's professional collaboration with Mr. Zuieback as "an example of what good looks like for a CV-1/CV-2 partnership." (Doc. # 85-1 at 325; Doc. # 85-4 at 4–5.)

The parties agree that Mr. Zuieback was a skilled sales representative for Novartis. (Doc. # 85-1 at 16.) Mr. Zuieback's starting base salary with Novartis was $132,000 and he received a $5,000 sign-on bonus. (Doc. # 85-3 at 2–3.)

## C.    EVALUATIONS AND OTHER SALARY CONSIDERATIONS

Novartis' People & Organizations department ("P&O") and Compensation Team make individual salary determinations within a salary range for each job. (Doc. # 86-2 at 21, 24–25, 35–40; Doc. # 86-9 at 15.) Recruiters are also involved in the hiring process which includes initial salary determinations. (Doc. # 86-2 at 24–25; Doc. # 86-9 at 15.) Brent Estabrooks—Novartis' Director, P&O Business Partner (Doc. # 86-5 at 2)—was involved in the recruitment of Ms. Littlewood and Mr. Zuieback, but otherwise their recruitment teams were different. (Doc. # 85-1 at 42, 45.) When Ms. Littlewood was hired, Novartis was expanding its sales team. (Doc. # 85-2 at 15.) Accordingly, Mr. Estabrooks and other recruitment team members were aware of what compensation packages were being offered to other sales representatives during this period. (Doc. # 86-2 at 27–29.) After an individual is employed by Novartis, their salary is reviewed annually by their manager through the performance review process discussed in detail below. (Doc. # 85-2 at 10–11.)

The parties agree that varying levels of experience—including time in the industry and specialization—education, and extracurricular involvement in marketing and volunteering, are appropriate considerations when determining compensation for a pharmaceutical sales representative.[4] (Doc. # 85-1 at 20, 49–50.) The parties also agree that a long period of consecutive employment for one company is "impressive," shows value to the employer, and indicates the employer and employee liked each other. (*Id.* at 17–18.)

To ensure competitiveness in hiring sales representatives, Novartis also considers external market data—including salary surveys of peer companies in the industry—to set compensation rates for its employees. (Doc. # 86-2 at 10–12.) Novartis claims that compensation reviews to ensure the company's competitiveness in the industry occur "regularly" including when hiring new employees. (Doc. # 85-2 at 8–10; Doc. # 86-10 at 21.) In the case of Ms. Littlewood and Mr. Zuieback, compensation for their positions was determined, in part, based off their qualifications and assessment of their ability to do the job, as determined through an interview. (Doc. # 85-2 at 10.)

Ms. Littlewood and Mr. Zuieback both had bonus potential at Novartis. (Doc. # 85-6 at 5; Doc. # 86-1 at 22, 33.) This incentive compensation, as well as annual merit-based salary increases were based on the representative's annual performance review. (Doc. # 85-8 at 2; Doc. # 85-10 at 8; Doc. # 86-2 at 7–10; 43–47.) During performance reviews, Novartis employees receive an evaluation of "one" (below expectations), "two"

---

[4] The parties also appear to agree that "business variables" are considered in setting sales representatives' compensation. (Doc. # 85-1 at 10.) However, neither party defines these "business variables" and, thus, the Court is unable to evaluate their impact on salaries.

(meets expectations), or "three" (exceeds expectations) on each of two components: sales performance and Values & Behaviors ("V&B"). (Doc. # 86-2 at 43–49.) The sales performance component is based on a representative's rank: a "one" for sales representatives in the bottom ten percent of sales performance, a "three" for individuals in the top ten percent, and a "two" for all representatives in between. (*Id.*) A "one" in either category results in the sales representative being ineligible to receive a merit-based salary increase for that review period. (Doc. # 85-2 at 9, 23; Doc. # 85-4 at 11; Doc. # 86-10 at 22.) Timothy Vannaman—Novartis' Regional Director of the Mountain West Region as of his hire in April 2018—describes annual reviews as "objective" and testified that managers have no discretion in the process. (Doc. # 85-10 at 5, 7.) However, Stephanie DiCicco—the Senior People Partner with Novartis' P&O (or human resources) department—testified that "[i]t is all how you cut and interpret the data." (Doc. # 86-2 at 57.)

Ms. Littlewood was always rated a 2 or better on V&B. (Doc. # 86-8 at 5.) However, Ms. Littlewood was ranked in the bottom ten percent of all sales specialists in 2017 and 2018, resulting in a "one" in the sales performance category, and a 1.2 overall rating, for these two years.[5] (Doc. # 85-1 at 47, 306, 317.) In 2019 Ms. Littlewood's overall rating was 2.2. (*Id.* at 329.) Ms. Littlewood did not receive an official ranking for 2020 but she did have a mid-year review which contains some indications of poor performance. (Doc. # 86-1 at 54–55; Doc. # 86-8 at 9); *see also* (Doc. # 85-1 at 330–33;

---

[5] The overall rating is formatted as [rating for sales performance].[rating for V&B]. (Doc. # 85-2 at 23.) Thus, a 1.2 represents a "one" in the sales performance category and a "two" on V&B.

Doc. # 85-10 at 22.) Mr. Zuieback's ratings for the years 2017, 2018, and 2019 were identical to Ms. Littlewoods. *See* (Doc. # 85-1 at 274, 284, 294; Doc. # 86-2 at 58–59.)

In addition to this incentive compensation program, Novartis employees can earn salary increases through "internal pay alignment." (Doc. # 86-2 at 12.) Internal pay alignment is a process by which Novartis attempts to understand where individuals fall in reference to peers within the company. (*Id.*) The salary of an employee who does not earn annual merit increases based on their performance, may fall out of the salary range or "benchmark" for their position over time. (Doc. # 85-2 at 9; Doc. # 86-2 at 12.) Such an individual might have their salary increased by means of internal pay alignment. (Doc. # 86-2 at 12.) Ms. Littlewood received such an increase of two percent in July 2020. (Doc. # 85-1 at 48; Doc. # 85-2 at 78); *see also* (Doc. # 86-10 at 21–22.)

In 2020 Ms. Littlewood received two disciplinary warnings for failure to comply with Novartis policies related to (1) "Conventions, Exhibits and Displays" and (2) the provision of meals. (Doc. # 86-1 at 31–32, 37–41, 75.) Ms. Littlewood is not aware of any similar policy violations by Mr. Zuieback. (Doc. # 85-1 at 36, 46.) Although Ms. DiCicco testified that discipline/compliance issues can impact an employee's compensation (Doc. # 85-2 at 10), neither party presents evidence explaining what, if any, was the direct impact of Ms. Littlewood's violations—and Mr. Zuieback's lack thereof—on their compensation. *See generally* (Docs. ## 85–87.) Ms. Littlewood was never issued a performance improvement plan during her employment with Novartis. (Doc. # 53 at ¶ 16.)

Novartis terminated both Ms. Littlewood and Mr. Zuieback in December 2020. *See* (Doc. # 86-10 at 8, 14.) At this time, Ms. Littlewood's base salary was $109,629.85 and Mr. Zuieback's was $133,540.03. (Doc. # 86-2 at 32–35; Doc. # 86-8 at 10.) Ms. Littlewood became aware of this pay disparity following her termination from Novartis. (Doc. # 86-1 at 81.)

On December 18, 2023, Novartis filed the instant Motion for Summary Judgment. (Doc. # 85.) Ms. Littlewood filed a Response (Doc. # 86)[6], and Novartis followed with its Reply (Doc. # 87). Thus, the matter is ripe for review.

## II.     LEGAL STANDARDS

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *See id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

---

[6] The Court notes that Ms. Littlewood now proceeds *pro se*. (Doc. # 93.) However, at the time she filed her Response, Ms. Littlewood was represented by counsel.

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in his favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671.

### III.   **DISCUSSION**

As an initial matter, the Court notes that Novartis repeatedly asserts that Ms. Littlewood's EPA claim is limited to the allegation that "Mr. Zuieback was paid a higher salary than [Ms. Littlewood] when he was hired." (Doc. # 85 at 2); *see also* (Doc. # 87 at 4–5.) Ms. Littlewood responded that her claim is "based on the difference in pay

between her and [Mr.] Zuieback . . . for the five years [she] worked at Novartis."[7] (Doc. # 86 at 5.) The operative Third Amended Complaint asserts that "Novartis violated the EPA by paying [Ms.] Littlewood less than her male counterpart for doing the same job." (Doc. # 53 at ¶ 27.) As there is no language in the Complaint limiting Ms. Littlewood's claim to the moment of hiring, the Court concludes that the claim encompasses the entire period during which Novartis paid Mr. Zuieback more than Ms. Littlewood.

## A.   APPLICABLE LAW

The EPA prohibits wage discrimination between employees on the basis of sex. 29 U.S.C. § 206(d)(1). To establish a prima facie case under the EPA, a plaintiff must provide admissible evidence demonstrating that: (1) she was performing work which was substantially equal to that of the male employee(s) she has identified considering the skills, duties, supervision, effort, and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; and (3) the male employee(s) were paid more under the same circumstances. *Riser v. QEP Energy*, 776 F.3d 1191, 1200 (10th Cir. 2015). Importantly, unlike claims brought pursuant to Title VII of the Civil Rights Act of 1964, there is no requirement under the EPA that a plaintiff establish discriminatory intent. *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1310–11 (10th Cir. 2006). Rather the EPA "has been described as imposing a form of strict liability on

---

[7] Mr. Zuieback worked at Novartis for less than four years, from March 2016 to December 2020. (Doc. # 85-3 at 3; Doc. # 86-10 at 14.)

employers who pay males more than females for performing the same work." *Id.* at 1310.

Work is "substantially equal" under the EPA if it requires "equal skill, effort, and responsibility." 29 U.S.C. § 206(d)(1). Guidance on what constitutes "equal skill, effort, and responsibility" is somewhat difficult to parse. On the one hand, the United States Court of Appeals for the Tenth Circuit has explicitly stated that the "equal work" requirement of the EPA is not construed "broadly" and "failure to furnish equal pay for 'comparable work' or 'like jobs' is not actionable." *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1364 (10th Cir. 1997). On the other hand, "[i]t should be kept in mind that 'equal' does not mean 'identical,'" therefore, "[i]nsubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable." 29 C.F.R. § 1620.14. Ultimately, "[w]hat constitutes equal skill, equal effort, or equal responsibility cannot be precisely defined," but must take into consideration "the broad remedial purpose of the law." *Id.* Therefore, to determine whether two positions require "substantially equal" work, a trier of fact must ultimately "make a practical judgment based on all the facts and circumstances of the case. . . . As a result, summary judgment on this issue often will be inappropriate." *Casalina v. Moniz*, No. CV 13-535 KG/WPL, 2016 WL 7486190, at *5 (D.N.M. Oct. 27, 2016), *aff'd sub nom. Casalina v. Perry*, 708 F. App'x 938 (10th Cir. 2017).

If a plaintiff establishes a prima facie case, the burden of persuasion shifts to the defendant to show that the pay disparity was justified by one of the four "affirmative

defenses" identified in the statute: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Riser*, 776 F.3d at 1198 (quoting 29 U.S.C. § 206(d)(1)); *see also Cnty. of Wash. v. Gunther*, 452 U.S. 161, 168 (1981) (describing these as the EPA's "four affirmative defenses"). Despite the apparently broad language of "any other factor other than sex," at least six circuit courts have held that "the scope of the fourth exception is limited" to "job-related factors" such as "legitimate differences in responsibilities or qualification for specific jobs." *Rizo v. Yovino*, 950 F.3d 1217, 1223–24, 1226 (9th Cir. 2020) (citing cases from the Second, Fourth, Six, Tenth, and Eleventh Circuits including, *e.g.*, *Riser*, 776 F.3d at 1198); *id.* (explaining that a factor other than sex "serves as a defense only where any resulting difference in pay is 'rooted in legitimate business-related differences in work responsibilities and qualification for the particular positions at issue.'" (quoting *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 525 (2d. Cir. 1992)).

To meet its burden, "an employer must 'submit evidence from which a reasonable factfinder could conclude not merely that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity.'" *Riser*, 776 F.3d 1191, 1198 (quoting *Mickelson*, 460 F.3d at 1312). To obtain summary judgment on an EPA affirmative defense, the employer must "prove at least one affirmative defense so clearly that no rational jury could find to the contrary." *Mickelson*, 460 F.3d at 1311 (citation omitted); *see also Tenkku v. Normandy Bank*, 348 F.3d 737, 741 n. 2 (8th Cir. 2003) ("At the summary judgment stage of the proceedings,

the employer's justification for the differences is irrelevant, unless it is strong enough to establish one of the statutory affirmative defenses as a matter of law.").

**B.    ANALYSIS**

    1.    <u>Equal Work</u>

Novartis does not contest that Mr. Zuieback was paid more than Ms. Littlewood. *See Riser*, 776 F.3d at 1200. Rather, Novartis' first argument is that it is entitled to summary judgment because Ms. Littlewood has not met her burden to establish that her work was "substantially equal" to that of Mr. Zuieback. (Doc. # 85 at 15.) Specifically, Novartis contends that Ms. Littlewood and Mr. Zuieback "held different roles[,] worked in different clinical areas with regard to the medical providers they approached and sold to[, and] at times, worked in different territories." (*Id.*) According to Novartis, this resulted in differing levels of "effort and responsibilities for their positions." (*Id.*)

Ms. Littlewood, on the other hand, argues that she and Mr. Zuieback "held the same job title, serviced the same territory, and sold the same drug." (Doc. # 86 at 5–6, 20.) For example, Ms. Littlewood testified that "the vast majority" of the doctors on her and Mr. Zuieback's customer lists were the same. (Doc. # 86-1 at 14–17.) Mr. Zuieback's affidavit supports Ms. Littlewood's testimony, stating that he and Ms. Littlewood "held the same job title, serviced the same territory, sold the same drug, and

had the same sales goals. Our positions were 'mirror' images of each other." (Doc. # 86-12 at 2.)[8]

Other evidence in the record supports, at a minimum, the existence of a dispute of material fact on the substantial equality of the skill, effort, and responsibility required by Ms. Littlewood's and Mr. Zuieback's positions. First, the job descriptions and requisitions—which outline duties and qualifications—for the positions filled by Ms. Littlewood and Mr. Zuieback are nearly substantively identical despite some formatting differences. *Compare* (Doc. # 86-5); *with* (Doc. # 86-6.)

Further, Novartis' own evidence consists of an array of contradictory statements and testimony regarding the similarities between Ms. Littlewood's and Mr. Zuieback's roles. For example, in their Response to Plaintiff's First Requests for Admissions, Novartis admits that Ms. "Littlewood and [Mr.] Zuieback held the same job title, serviced the same territory and sold the same drug at Novartis." (Doc. # 86-8 at 9.) In contrast, Mr. Gatrell testified that Ms. Littlewood and Mr. Zuieback had "two different responsibilities in the same territory." (Doc. # 86-10 at 19–20.) Specifically, Ms. Littlewood was a CV1 while Mr. Zuieback was a CV2, meaning they had "different sales targets, different goals, [and] their maps were a little different." (Doc. # 85-4 at 20.) Mr. Vannaman, agreed that Ms. Littlewood and Mr. Zuieback held the same job title, sold the same drug, and that their "[t]erritories were similar in that they were in the same

---

[8] Novartis encourages the Court to disregard Ms. Littlewood's "self-serving" testimony and Mr. Zuieback's affidavit as consisting of conclusory statements insufficient to carry Ms. Littlewood's burden. (Doc. # 87 at 3 (quoting *Bones*, 366 F.3d at 875).) The evidence comparing Ms. Littlewood's and Mr. Zuieback's job responsibilities is not conclusory and simply because a plaintiff's testimony supports her case does not render such testimony inadmissible. It is a matter for the jury to evaluate the credibility of these witnesses. *Allen*, 119 F.3d at 839.

geographic area to some extent with some overlap" (Doc. # 86-9 at 32), but testified that they reported to different managers and had different goals. (*Id.* at 32–33.) Neither Mr. Gatrell nor Mr. Vannaman explain how Ms. Littlewood's targets or goals differed from Mr. Zuieback's, nor how having different managers and slightly different territories resulted in meaningfully different conditions or required differing levels of skill, effort, or responsibility. *See Riser*, 776 F.3d at 1200.

The only distinction the Court can discern from the totality of the evidence regarding the two positions is that Mr. Zuieback (as a CV2) focused on primary care doctors, while Ms. Littlewood (as a CV1) focused on cardiologists, which resulted in them reporting to different managers. *See* (Doc. # 85-4 at 20; Doc. # 86-9 at 32.) However, there is no evidence in the record, apart from Novartis' own self-serving and (actually) conclusive arguments, to indicate that the distinction between a CV1 and a CV2 reflects more than mere "[i]nsubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs." 29 C.F.R. § 1620.14.

Accordingly, the Court concludes Ms. Littlewood has met her burden to point to "specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find" that she performed substantially equal work to Mr.

Zuieback. *Adler*, 144 F.3d at 671; *Riser*, 776 F.3d at 1200. Summary judgment on this issue is, therefore, inappropriate.

      2.    <u>Affirmative Defenses</u>

Novartis argues that, even if Ms. Littlewood can establish a prima facie case for unequal pay, it is entitled to summary judgment because the evidence establishes that the disparity between Ms. Littlewood and Mr. Zuieback's base salaries was justified by differences other than sex. (Doc. # 85 at 15–19; Doc. # 87 at 8–11.) Specifically, Novartis points to Mr. Zuieback's (1) years of consecutive experience at Merck, which it contends is a "top competitor" of Novartis, (2) MBA, (3) higher salary at Merck, and (4) community involvement. (Doc. # 85 at 16–18; Doc. # 87 at 10.) Novartis also points to Ms. Littlewood's 2020 "performance problems" as a "sufficient basis for a pay differential." (Doc. 85 at 18–19.) The Court will address each of these alleged affirmative defenses in turn.

First, the Court concludes that a dispute of material fact exists regarding Novartis' argument that Mr. Zuieback's higher salary was justified by the quality and quantity of his experience at Merck. (Doc. # 85 at 16–17; Doc. # 87 at 10.) First, the parties dispute whether Merck was in fact a competitor of Novartis in the area of cardiovascular drugs. *Compare* (Doc. # 85-6 at 4; Doc. # 85-7 at 3–4), *with* (Doc. # 86-1 at 13.) There is no objective evidence on this point in the record. Second, although the parties agree that Mr. Zuieback's 17 years of consecutive experience at a large pharmaceutical company was "impressive" (Doc. # 85-1 at 17), it is unclear why Ms. Littlewood did not similarly receive an equal financial benefit for her 14 years of

consecutive experience at La Roche. (Doc. # 86-1 at 51; Doc. # 86-11 at 2–3; Doc. # 86-2 at 22–23.) According to Ms. Littlewood's testimony, Novartis' assertion that "Mr. Zuieback had 17 years of pharmaceutical sales experience, all of which was with a comparable large pharmaceutical company, that [Ms. Littlewood] did not have" is false. (Doc. # 85 at 17.) Prior to her two years at Pensacola, which the parties agree is a much smaller company, Ms. Littlewood apparently had more than 20 years of experience at large pharmaceutical companies including cardiology experience, experience in Colorado, and experience launching products, all of which was highly relevant to her role at Novartis. (Doc. # 86-1 at 8, 13, 25–26, 51; Doc. # 86-2 at 22–23; Doc. # 86-11 at 2–3.) Therefore, although Mr. Zuieback's experience at Merck "*could* explain the wage disparity, [the Court] cannot conclude, as a matter of law, that it *in fact* explained the wage disparity." *Mickelson*, 460 F.3d at 1312.

Turning to Mr. Zuieback's advanced degree, it is true that this is an objective difference other than sex between Ms. Littlewood and Mr. Zuieback. (Doc. # 85-1 at 27; Doc. # 85-2 at 33; Doc. # 85-5 at 3; Doc. # 85-10 at 13; Doc. # Doc. # 86-11 at 2–3.) It is also true that sister courts have found that an advanced degree is a factor that may justify a pay disparity. *See Casalina*, 708 F. App'x at 941; *Pinkard v. Hilti, Inc.*, No. 11–CV-454-JED-PJC, 2013 WL 2634938, at *6 (N.D. Okla. June 11, 2013). However, in these cases the male employee with the higher salary had **both** an advanced degree and more years of relevant experience. A rational jury could find that additional years of relevant experience are as valuable as an MBA. Accordingly, the Court concludes that Novartis has not established this affirmative defense "so clearly that no rational jury

could find to the contrary" as required at the summary judgment phase. *Mickelson*, 460 F.3d at 1311.

Mr. Zuieback's engagement with local organizations is another objective difference between him and Ms. Littlewood. (Doc. # 85-5 at 2–3); *see also* (Doc. # 85-1 at 43–44.) However, as discussed above, a factor other than sex "serves as a defense only where any resulting difference in pay is 'rooted in legitimate business-related differences in work responsibilities and qualification for the particular positions at issue.'" *Riser*, 776 F.3d at 1198. As Ms. Littlewood points out, Mr. Zuieback's position description makes no references to community involvement as a required or preferred qualification (Doc. # 86-6), and there is no evidence in the record to suggest that Mr. Zuieback utilized this experience at Novartis. *See Mickelson*, 460 F.3d at 1313 (noting that a defendant's proffered justification for a pay disparity was insufficient for summary judgment where "conspicuously missing from the record is any suggestion" that the higher paid male employee used the experience in his position). Accordingly, the Court concludes a genuine dispute of material fact remains regarding this alleged justification for the pay differential.

Next, Novartis argues that it offered and paid Mr. Zuieback a higher base salary because he was paid more at Merck than Ms. Littlewood was paid at Pensacola. (Doc. # 17–18.) There are several problems with this argument. First, as the Tenth Circuit has explained "the EPA 'precludes an employer from relying solely upon a prior salary to justify pay disparity.'" *Riser*, 776 F.3d at 1199 (quoting *Angove v. Williams-Sonoma, Inc.*, 70 F. App'x 500, 508 (10th Cir. 2003)). Rather, an employer may "utilize prior pay

as part of a mixed-motive, such as prior pay and more experience." *Irby v. Bittick*, 44 F.3d 949, 955 (11th Cir. 1995). Although Novartis attempts to establish such a "mixed-motive" for the pay disparity at issue, as discussed above, genuine disputes of material fact remain as to Mr. Zuieback and Ms. Littlewood's relative experience. Second, this rationale does not fully account for the pay disparity between Ms. Littlewood and Mr. Zuieback. When Ms. Littlewood came to Novartis, she received a $1,207 (or approximately 1.2 percent) salary increase as compared to her Pensacola base salary. (Doc. # 86-1 at 21–22.) Mr. Zuieback's base salary, on the other hand, increased $12,000, or 10%, when he transitioned from Merck to Novartis.[9] (Doc. # 85-1 at 46; Doc. # 85-2 at 18; Doc. # 85-3 at 2; Doc. # 85-6 at 5; Doc. # 85-7 at 4–5.) Additionally, the parties dispute whether Ms. Littlewood attempted to negotiate her base salary during her hiring process. *Compare* (Doc. # 85-2 at 15; Doc. # 85-6 at 5; Doc. # 85-7 at 4–5), *with* (Doc. # 86-1 at 22.)

Finally, the Court finds Novartis' attempt to rely on Ms. Littlewood's 2020 "disciplinary issues" to explain the pay disparity disingenuous. As discussed above, Novartis has not pointed to any testimony or evidence indicating that these compliance problems impacted Ms. Littlewood's salary or even her potential for a merit increase in 2020. Even if there was evidence that Ms. Littlewood's pay was docked or she was denied a merit increase because of this discipline, such evidence would account for a

---

[9] These numbers take into consideration the $5,000 merit increase Mr. Zuieback was set to receive at Merck. (Doc. # 85-2 at 18; Doc. # 85-6 at 5; Doc. # 85-7 at 4–5.) The salary increase offered by Novartis is even greater if compared to the salary Mr. Zuieback actually received from Merck.

pay disparity lasting only a few months and obviously sheds no light on any justification for the salary difference during the preceding three years.

The evidence related to Ms. Littlewood's and Mr. Zuieback's performance reviews is similarly a red herring. The undisputed material facts demonstrate that Ms. Littlewood and Mr. Zuieback had identical overall performance review ratings for 2017, 2018, and 2019. *See* (Doc. # 85-2 at 330–33; Doc. # 85-2 at 700–57.) Thus, these reviews cannot account for a single penny of the base salary disparity between Ms. Littlewood and Mr. Zuieback. *See* (Doc. # 85-2 at 9, 23; Doc. # 85-4 at 11; Doc. # 86-10 at 22.) Additionally, it is undisputed that neither Ms. Littlewood nor Mr. Zuieback received a merit-based salary increase in 2020 because they were both terminated prior to their annual review. (Doc. # 86-1 at 54–55; Doc. # 86-8 at 9; Doc. # 86-10 at 8, 14); *see also* (Doc. # 85-1 at 330–33; Doc. # 85-10 at 22.) There is simply zero evidence that performance or discipline had any impact on Ms. Littlewood and Mr. Zuieback's base salaries and, therefore, these factors appear wholly irrelevant to the EPA analysis.

In summary, the Court cannot conclude that Novartis has "prove[n] at least one affirmative defense so clearly that no rational jury could find to the contrary." *Mickelson*, 460 F.3d at 1311. Accordingly, the Court denies summary judgment.

## IV.   **CONCLUSION**

For the foregoing reasons, Defendant Novartis Pharmaceuticals Corp.'s Motion

for Summary Judgment (Doc. # 85) is DENIED.

DATED: April 24, 2024

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
Senior United States District Judge